## NO. 24-1288

In The
# United States Court of Appeals
## For The Fourth Circuit

---

**O.W.,**

*Plaintiff – Appellant,*

**v.**

**MARIE L. CARR, police officer in her individual and official capcities; REID BAKER, assistant principal in his individual and official capacities; SCHOOL BOARD OF THE CITY OF VIRGINIA BEACH, VIRGINIA, a body corporate; CITY OF VIRGINIA BEACH, a body politic and corporate,**

*Defendants – Appellees,*

---

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK**

---

**OPENING BRIEF OF APPELLANT**

---

**Makiba A. Gaines, Esq.**
**VSB No. 93983**
**POLARIS LAW FIRM**
**1403 Greenbrier Parkway Suite 220**
**Chesapeake, VA 23320**
**Phone: (757) 905-2079**
**mg@legalhelp757.com**
*Counsel for Appellant*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

**DISCLOSURE STATEMENT**

- In civil, agency, bankruptcy, and mandamus cases, a disclosure statement must be filed by **all** parties, with the following exceptions: (1) the United States is not required to file a disclosure statement; (2) an indigent party is not required to file a disclosure statement; and (3) a state or local government is not required to file a disclosure statement in pro se cases. (All parties to the action in the district court are considered parties to a mandamus case.)
- In criminal and post-conviction cases, a corporate defendant must file a disclosure statement.
- In criminal cases, the United States must file a disclosure statement if there was an organizational victim of the alleged criminal activity. (See question 7.)
- Any corporate amicus curiae must file a disclosure statement.
- Counsel has a continuing duty to update the disclosure statement.

No. 24-1288        Caption: O.W. v. City of Virginia Beach, et al.

Pursuant to FRAP 26.1 and Local Rule 26.1,

O.W.
(name of party/amicus)


who is _____appellant_____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?     YES ☐ NO ☑

2.    Does party/amicus have any parent corporations?              ☐ YES ☑ NO
      If yes, identify all parent corporations, including all generations of parent corporations:




3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?              ☐ YES ☑ NO
      If yes, identify all such owners:

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation?    ☐YES ☑NO
      If yes, identify entity and nature of interest:

5.    Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
      If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.    Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
      If yes, the debtor, the trustee, or the appellant (if neither the debtor nor the trustee is a party) must list (1) the members of any creditors' committee, (2) each debtor (if not in the caption), and (3) if a debtor is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of the debtor.

7.    Is this a criminal case in which there was an organizational victim?    ☐YES ☑NO
      If yes, the United States, absent good cause shown, must list (1) each organizational victim of the criminal activity and (2) if an organizational victim is a corporation, the parent corporation and any publicly held corporation that owns 10% or more of the stock of victim, to the extent that information can be obtained through due diligence.

Signature: _____        Date: _____04/19/2024_____

Counsel for: __O.W._____

Print to PDF for Filing

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................. iii

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW .....................................1

STATEMENT OF THE CASE...............................................................2

    I.    Introduction........................................................................2

    II.    Statement of the Facts..........................................................3

        a.  The Criminal Investigative Practice ...................................3

        b.  O.W.'s Criminal Investigation .......................................8

    III.    Procedural History ..............................................................14

SUMMARY OF THE ARGUMENT .......................................................15

STANDARD OF REVIEW ..................................................................17

ARGUMENT ...............................................................................18

    1.    THE WARRANTLESS, CONSENTLESS CELLULAR PHONE SEARCH VIOLATED O.W.'S RIGHT UNDER THE FOURTH AMENDMENT ................................................................18

        A. The Special Needs Doctrine does not Apply to the Search because the Search was Intended to Yield Criminal Evidence...........23

        B. Even under the Special Needs Doctrine, the Search was Unreasonable because it was not Justified at its Inception, and the Scope of the Search is not Known ...............................29

        C. *T.L.O.* does not Authorize Warrantless Cellular Phone Searches in the Public School Setting .............................................32

2.    O.W.'S CONFESSIONS WERE INVOLUNTARY UNDER THE FIFTH AMENDMENT'S SELF-INCRIMINATION CLAUSE AND THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE................................................................................33

3.    A CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983 REQUIRES PROOF OF CONCERTED CONDUCT AND NOT ADDITIONAL PROOF OF CONSPIRATORIAL INTENT .............................................37

4.    THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANT FAILED TO ESTABLISH HIS CLAIMS UNDER *MONELL* ................................................................................41

5.    THE DISTRICT COURT ERRED IN DENYING APPELLANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT ..........................41

CONCLUSION ................................................................................42

REQUEST FOR ORAL ARGUMENT ................................................42

CERTIFICATE OF COMPLIANCE .....................................................44

CERTIFICATE OF SERVICE .............................................................44

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242, 106 S. Ct. 2505 (1986) ................................................ 18

*Andes v. Versant Corp.*,
    788 F.2d 1033 (4th Cir. 1986) ...................................................... 41-42

*Bd. of Educ. v. Earls*,
    536 U.S. 822 (2002) ........................................................................ 27

*Camreta v. Greene*,
    131 S. Ct. 2020 (2011) .................................................................... 24

*Chambers v. Florida*,
    309 U.S. 227, 60 S. Ct. 472 (1940) .................................................. 35

*Commonwealth v. Gatewood*,
    No. 1420-12-1, 2013 Va. App. LEXIS 27 (Va. Ct. App. Jan. 22, 2013) .... 35-36

*Couch v. United States*,
    409 U.S. 322, 93 S. Ct. 611 (1973) .................................................. 35

*Direct Sales Co. v. United States*,
    319 U.S. 703, 63 S. Ct. 1265 (1943) ................................................ 40

*Ferguson v. City of Charleston*,
    532 U.S. 67, 121 S. Ct. 1281 (2001) ....................................... *passim*

*Florence v. Bd. of Chosen Freeholders*,
    566 U.S. 318, 132 S. Ct. 1510 (2012) .............................................. 31

*Greene v. Camreta*,
    588 F.3d 1011 (9th Cir. 2009) ......................................................... 24

*Greene. C.B. v. City of Sonora*,
    769 F.3d 1005 (9th Cir. 2014) ......................................................... 24

*Griffin v. Wisconsin*,
    483 U.S. 868 (1987) ........................................................................ 27

*Hafner v. Brown*,
    983 F.2d 570 (4th Cir. 1992) ...................................................... 38, 39

*Haley v. Ohio*,
  332 U.S. 596, 68 S. Ct. 302 (1948) .................................................... 35

*Hinkle v. City of Clarksburg*,
  81 F.3d 416 (4th Cir. 1996) ........................................................ 37, 38

*Hutto v. Ross*,
  429 U.S. 28, 97 S. Ct. 202 (1976) ................................................ 33

*J.D. ex rel. Doherty v. Colonial Williamsburg Found.*,
  925 F.3d 663 (4th Cir. 2019) ..................................................... 17, 18

*J.D.B. v. North Carolina*,
  564 U.S. 261, 131 S. Ct. 2394 (2011) ......................................... 5, 39

*Johnson v. United States*,
  228 U.S. 457, 33 S. Ct. 572 (1913) ................................................ 35

*Jones v. Hunt*,
  410 F.3d 1221 (10th Cir. 2005) ................................................ 23-24

*Katz v. United States*,
  389 U.S. 347 (1967) ......................................................................... 19

*Knibbs v. Momphard*,
  30 F.4th 200 (4th Cir. 2022) ......................................................... 18

*Laird v. Fairfax Cnty.*,
  978 F.3d 887 (4th Cir. 2020) ......................................................... 18

*Lefkowitz v. Turley*,
  414 U.S. 70 (1973) ........................................................................... 33

*Lyons v. Oklahoma*,
  322 U.S. 596, 64 S. Ct. 1208 (1944) ............................................. 34

*Maine v. Moulton*,
  474 U.S. 159, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985) .................... 35

*Mann v. Cnty. of San Diego*,
  907 F.3d 1154 (9th Cir. 2018) ........................................................ 24

*Massiah v. United States*,
  377 U.S. 201, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) .................... 35

*Miranda v. Arizona,*
    384 U.S. 436, 86 S. Ct. 1602 (1966) ............................................ 5, 23

*Monell v. Dep't of Soc. Servs.,*
    436 U.S. 658, 98 S. Ct. 2018 (1978) ............................................ 2, 41

*Nat'l Treasury Employees Union v. Von Raab,*
    489 U.S. 656 (1989) ................................................................... 27

*New Jersey v. T.L.O.,*
    469 U.S. 325, 105 S. Ct. 733 (1985) ..................................... *passim*

*O'Connor v. Ortega,*
    480 U.S. 709 (1987) ................................................................... 27

*Riley v. California,*
    573 U.S. 373, 134 S. Ct. 2473 (2014) ................................. 30, 31, 33

*Safford Unified Sch. Dist. #1 v. Redding,*
    557 U.S. 364, 129 S. Ct. 2633 (2009) ....................................... 29, 30

*Schneckloth v. Bustamonte,*
    412 U.S. 218, 93 S. Ct. 2041 (1973) ......................................... 36-37

*Skinner v. Ry. Labor Executives' Ass'n,*
    489 U.S. 602, 109 S. Ct. 1402 (1989) ............................................ 32

*Terry v. Ohio,*
    392 U.S. 1, 88 S. Ct. 1868 (1968) ............................................ 32, 33

*Thompson v. Louisiana,*
    469 U.S. 17, 105 S. Ct. 409 (1984) ............................................... 19

*Ullmann v. United States,*
    350 U.S. 422, 76 S. Ct. 497 (1956) ............................................... 34

*United States v. Braxton,*
    112 F.3d 777 (4th Cir. 1997) ....................................................... 33

*United States v. Burr,*
    25 F. Cas. 30 (C.C.D. Va. 1807) ................................................... 34

*United States v. Curry,*
    965 F.3d 313 (4th Cir. 2020) ....................................................... 28

*United States v. Goodson*,
   204 F.3d 508 (4th Cir. 2000) ............................................................. 41

*United States v. Martinez-Fuerte*,
   428 U.S. 543 (1976) ......................................................................... 27

*Vega v. Tekoh*,
   597 U.S. ___ (2022) ........................................................................ 33

*Vernonia Sch. Dist. 47J v. Acton*,
   515 U.S. 646, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995) .......................... 23, 27

*Wofford v. Evans*,
   390 F.3d 318 (4th Cir. 2004) ........................................................... 32

## Statutes

28 U.S.C. § 1291 ................................................................................. 1

28 U.S.C. § 1331 ................................................................................. 1

42 U.S.C. § 1983 ........................................................ 2, 17, 37, 38, 39

## Rules

Fed. R. Civ. P. 41 ............................................................................. 42

Fed. R. Civ. P. 56 ....................................................................... 18, 41

## Constitutional

U.S. CONST. AMEND. IV ..................................................................... 18

U.S. CONST. AMEND. V ...................................................................... 33

## Other Authorities

Civil Rights Data Collection (ed.gov) ..................................................... 29

Virginia Department of Education's Safe Schools Information Report Data
Retrieval tool; Gabriella Souza, *Racial Disparities Get Beach Schools Chief's
Attention,* THE VIRGINIAN-PILOT (February 19, 2015) ................................... 29

## JURISDICTIONAL STATEMENT

The district court had jurisdiction pursuant to 28 U.S.C. § 1331 because the lawsuit was filed to vindicate rights guaranteed to the Plaintiff-Appellant under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution. The district court entered an order granting the Defendant-Appellees' separately filed motions for summary judgment and denying the Plaintiff-Appellant's motion for partial summary judgment on February 14, 2023. JA1162-1163. The Plaintiff-Appellant filed a notice of appeal on February 17, 2023. JA1164-1165. This Court dismissed the appeal as premature on January 3, 2024, finding that "the district court '[wa]s not finished with the case.'" On March 5, 2024, the district court ordered that the previously appealed summary judgment order, "ECF No. 151 is final." JA1174. Under 28 U.S.C. § 1291, this Court has appellate jurisdiction over the final judgment which disposed of all the Plaintiff-Appellant's claims.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1. Whether, in the absence of an exigency, a warrantless, consentless search of a student's cellular phone, violates the student's Fourth Amendment right against an unreasonable search when the search is performed by a school official working cooperatively with police and intended to yield criminal evidence?

2. Whether, under the Fifth Amendment's Self-Incrimination Clause and the Fourteenth Amendment's Due Process Clause, a thirteen-year-old student's confession was voluntary where the student was required to confess orally and in writing to a school official working cooperatively with the police?

3. Whether a civil conspiracy under 42 U.S.C. § 1983 requires proof of concerted conduct and additional proof of conspiratorial intent?

4. Under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 664, 98 S. Ct. 2018, 2022 (1978), whether a government body is responsible for its policies, practices, and customs of depriving students of rights and colluding to investigate students in a manner that avoids direct police action and deprives students of criminal procedural safeguards?

5. Whether the district court erred in denying Appellant's motion for partial summary judgment?

## STATEMENT OF THE CASE

### I.    Introduction

This lawsuit challenges the policies, practices, and customs of the Virginia Beach Police Department ("VBPD")[1] and Virginia Beach City Public Schools ("VBCPS")[2] of collaborating to detain, search, and interrogate students — to coerce their criminal confessions and gather bullet-proof evidence from them for arrests and prosecutions while they are on school grounds and unable to access their parents or attorneys for assistance.

This long-held joint investigative practice is especially harmful to the classes of students who are statistically more likely to enter the school system's disciplinary

---

[1]    The VBPD is a department of the City of Virginia Beach, Virginia. The City and Officer Marie Carr shall hereinafter, collectively, be referred to as the "City Appellees."

[2]    VBCPS is operated by the School Board of the City of Virginia Beach, Virginia. Reid Baker and the School Board shall hereinafter, collectively, be referred to as the "School Appellees."

channel and to be arrested on school grounds. VBCPS and VBPD have no safeguards in place to prevent school administrators and police officers from applying the search program and coercive investigative policy discriminately between students of different races, abilities, and socio-economic backgrounds.

## II.    Statement of the Facts

### a. The Criminal Investigative Practice

VBCPS and the VBPD operate under a written SRO partnership agreement [hereinafter referred to as the "partnership agreement" or the "memorandum of understanding"] to carry out the police department's objective of controlling crime inside VBCPS. JA334-JA340. As written, police officers are "responsible for law enforcement activities that occur on the school campus," JA334, but are not "responsible for enforcement of violations of school rules, regulations or administrative rules." JA335. Under the policy, school authorities make police officers aware of all suspected student criminality at outset of every criminal investigation. JA336 (MOU, at (iv)(B); JA413 (Dep. Tr. of Marie Carr, at 14:13-17); JA532 (admission no. 15).

Despite the presence of a police officer at the beginning of every criminal investigation, police officers and school authorities engage in what the police department refers to as "parallel investigations" where school authorities lead in interrogating and searching students while police officers contemporaneously gather

evidence during the single investigation. JA532 (admission no. 15); JA474-475

(Dep. Tr. of Reid Baker, vol. ii, at 78:24-25, 79:1-3); JA499-JA500 (Dep. Tr. of

Sergeant Luis Cortes)[3]; JA640 (stating "normally if there was a criminal

investigation, [Carr] will sit in."); JA913 (Dep. Tr. of Marie Carr, at 15:1-19).

> Q. Tell me about the process of conducting a criminal investigation on a student at school. Talk to me about the whole process you take.
>
> A. Depends on the investigation. What kind of investigation? Are you talking specifically the one that we are here for?
>
> Q. Well, no. Any investigation, is there a specific process that you have to take in order to conduct a criminal investigation?
>
> A. No.· It just depends on the situation. I mean, yes, we are in partnership with the school. If they come in -- if they call me and find out there is a -- that there might possibly be a criminal investigation, they have to alert me. So once they alert me and I come down, I usually take notes, because there is sometimes a lot of children involved -- students involved, so I have to write their names so I know who talked to who, who said what to who, so I take notes. And if a crime has occurred, then I know a crime has occurred, and then I -- I take over the investigation.

JA413 (Dep. Tr. of Marie Carr).

But Officer Carr did not lead criminal investigations until she first gathered

enough evidence to make an arrest. JA414.

> Q. So are you telling me you don't have to conduct a criminal investigation often? Most times, the school conducts the investigation that you need?

---

[3]   Sargent Cortes was Officer Marie Carr's direct supervisor. JA464.

A. The beginning part of it, yes. I mean, I still have to speak to the
witnesses. I still have to voucher the evidence. So, yes, they do conduct
a good part of the investigation, yes.

JA414 (Dep. Tr. of Marie Carr).

Instead of the script read by police officers under *Miranda v. Arizona*, 384
U.S. 436, 447, 86 S. Ct. 1602, 1614 (1966); *see also J. D. B. v. North Carolina*, 564
U.S. 261, 297, 131 S. Ct. 2394, 2418 (2011), O.W. was only warned about the
additional punishment he might have faced had he refused to confess to what Mr.
Baker believed he did, JA464 (Dep. Tr. of Reid Baker, at 95:14-20); JA635 (Carr
administered the *Miranda* warning to O.W. at 6:10 p.m.). According to Mr. Baker,
"part of [VBCPS'] script is like if we're talking with students and if they're not
telling us the truth, there's another violation against the Code of Student Conduct
where it could be like your (sic) not telling us the truth is another violation." JA882,
JA1262 (Dep. Tr. of Reid Baker).

Q: "When you say "our script," are you referring to a school policy for
administrators about how to interview students?

A. Yeah. Virginia Beach policy on like how to help kind of just go
along with our investigation process. Yeah. With Virginia Beach
schools. Yes.

JA882, JA1262 (Dep. Tr. of Reid Baker).

But school officials require students to write these confessions about their own
suspected criminal conduct. JA496-JA497, JA1422.

Q.· Okay. Have you ever -- has one of your officers ever described this statement to you?

A.· Yes. Yes. I know usually when -- what I was just stating, usually when something happens at the school and a child is involved, then they have to write an incident statement as to what occurred.

Q.· Okay. That the student has to write?

A.· That the student has to write in their own words. And I have seen one before, because I have seen one where a child wrote one. He wrote it out. But not this one in particular.

Q.· Okay. Do you know who requires the student to make a statement on this document?

A.· I believe it's the – I'm not a hundred percent sure, but I think the principal or whoever is doing the administrative investigation at the school has them fill this out.

JA495-496 (Dep. Tr. of Sergeant Luis Cortes).

Q. Do you know what your officers would have been using this statement for?

A.· In order to figure out if we had probable cause in order to make a criminal complaint against the student, you would have to have a basis. They have to have probable cause before they will bring a charge against a student.

JA497 (Dep. Tr. of Sergeant Luis Cortes).

The school routinely shares these records with police officers outside the judicial process for criminal evidentiary purposes.

Q. Could you tell me the process of one of your -- one of your direct reports should have taken if they wanted to get one of these statements from the school?

Page 6 of 44

> A.· They would have to speak with the – in my opinion, they would
> have to speak with the principal in order to get a copy of this.

JA496-497, JA985-JA986 (Dep. Tr. of Sergeant Luis Cortes).

For the last twenty years, throughout at least the thirty-two schools Sergeant Luis Cortes supervised, school authorities have been responsible for giving police officers all the criminal evidence they needed to arrest and prosecute students for criminal conduct occurring on school grounds. JA491, JA499, JA501.

> Q.· So when you say that the principal generally has everything that the
> SRO needs –
>
> A.· Uh-huh.
>
> Q.· -- how long has that been the -- been the case?
>
> . . . .
>
> THE WITNESS: I think that is how it's always been.

JA499-500, JA836-837 (Dep. Tr. of Sergeant Luis Cortes).

The partnership agreement also established methods for student searches and seizures, arrests, along with methods of evidence collection. JA335-JA338. The agreement provided little to no information about how the partnership agreement advanced any of the school system's goals related to discipline and order.

*b.  O.W.'s Criminal Investigation*

An older female student was said to have voluntarily "sexted" then-thirteen-year-old O.W. a nude picture[4] of herself on or around December 2018 or January 2019. JA504. Other students started to gossip about the photograph and asked O.W. whether the female student "really sen[t]" it to him. JA1422. On March 5, 2019, O.W. was believed to have displayed the photograph to other students at the lunchroom table and in care class and to have forwarded the photograph to then-twelve-year-old G.C., a white male student, upon G.C.'s request. JA632.

A student reported to a teacher that the female student "texted pictures of her 'parts' to [O.W.] and he has them on his phone." JA674. The teacher brought the information she received to the attention of acting Assistant Principal Reid Baker ("Mr. Baker" or "Baker"). JA526, JA1244. Mr. Baker first reported the incident to SRO Marie Carr ("Officer Carr") and told her that he was "calling down students regarding possible child pornography," JA632, JA914 (Dep. Tr. of Marie Carr, at 17:8-11). Mr. Baker alerted Officer Carr despite having four security guards on staff. JA435 (Dep. Tr. of Marie Carr, at 53:1-20). Mr. Baker testified that he did not know

---

[4]  The photograph is not on the record. For the purpose of this litigation and appeal, O.W. will not contest that the photograph is a "nude" image of the female student. He denies that the photograph constitutes child pornography under Virginia and/or federal law.

which, if any, school rule O.W.'s conduct might have violated at that time. JA878 (Dep. Tr. of Reid Baker, at 16:4-12).

Baker detained O.W. and led him to a guidance office to complete the investigation at around "two something" in the afternoon. JA632; JA1235 (O.W. Dep. Tr. 45:13-17). When asked for more information about his detention, Mr. Baker told O.W., "Just come down to me" and "Don't lie to me." JA1417. The guidance office was about 72 square feet and located inside a larger guidance department, JA527 (Dep. Tr. of Reid baker, at 11:13-19), where a secretary sat, JA952. O.W. sat on the opposite side of Mr. Baker's desk, and Officer Carr sat in the seat nearest the door. JA1261 (Dep. Tr. of Reid Baker, at 42:1-8). On the way to the guidance office, Baker stopped inside the printing room, briefly questioned O.W. and again warned him about the consequences of being untruthful in the investigation. JA949-JA950, JA1232. Mr. Baker then told O.W. to write the first statement about his suspected criminal conduct. JA1422. Mr. Baker told O.W. that he did not give enough information in his first statement; Mr. Baker discarded the first statement and told O.W. to write a better statement. JA518-JA519 (Dep. Tr. of O.W., at 32:20-23); JA486-JA487. O.W. did not recall the exact contents of his first statement, but he recalled admitting that he showed other students "the photo." JA518. But he had not given any details about the contents of the photograph at that time, and he also had

not confessed regarding the identity of the person who created and sent the photograph to him. JA675.

Officer Carr was waiting inside the guidance office for O.W. and Mr. Baker to arrive; she left the guidance office with Mr. Baker and returned shortly thereafter asking O.W. for his and his parents' identifying information. JA519, JA1419 (Dep. Tr. of O.W., at 42:14-19). Officer Carr testified that she was inside the office with O.W. and Mr. Baker to investigate suspected criminal conduct rather than to preserve order or assist with the disciplinary investigation. JA428 (Dep. Tr. of Marie Carr, at 30:3-11).

Baker and Carr questioned O.W. together, JA469, JA638, JA952. According to Mr. Baker, Officer Carr did not actually interrogate O.W., she only asked O.W. clarifying questions about his suspected criminal conduct. JA638 (City of Virginia Beach, Admin. Investigation).

"At first, [O.W.] stated he did not have any photos, and then he stated he forgot he had the photo." JA632. "Baker told [O.W.] what he was telling him just did not make sense." JA421, JA632 (Dep. Tr. of Reid Baker, at 64:11-21). "Mr. Baker asked what happened during lunch. [O.W.] stated nothing happened during lunch." JA632. Mr. Baker confronted O.W. with some of the evidence he already had against him. JA632, JA822 (Dep. Tr. of Reid Baker, at 68:12-21), JA904. O.W. "told Mr. Baker that [G.C.] was one of the students who saw the photo, asked to use

his iPhone to call someone, and then sent the photo to himself without permission."

JA632. "Mr. Baker asked for his phone, and asked if he still had the inappropriate

photo on the phone. [O.W.] stated he deleted the photo." JA632. Mr. Baker testified

that he very likely told O.W.:

> So, Sit down, like, Let's talk about the situation. We were informed that you were potentially sharing and showing inappropriate photos. Can you tell me what's going on? Why are we getting these reports from other students and teachers in the building? **I need you to write a statement. I need you to tell me everything** of what was going on revolving [sic] this. **Write a statement.** Read the statement. Kind of like, **So this is what you wrote. Are you telling me the truth.** Is this where it happened? If I'm doing a follow-up after talking with other students, like I'm getting a different version of the story, Are you telling me the truth? **Like if you're not telling me the truth, you know, there's a violation against the Student Code of Conduct where if you're not telling me the truth, that can be something else.** So I need you to be honest with me, please tell me what was going on.

JA902 (Dep. Tr. of Reid Baker) (emphasis added).

Officer Carr told O.W., "Even if you deleted something, we can still find the

image on your phone." JA639.

O.W. ultimately confessed that he possessed the photograph, that it was a nude

image of the female student, and that he forwarded it to the other student upon that

student's request. JA632.

Mr. Baker confiscated O.W.'s cellular phone and searched its digital data.[5] JA955 (Dep. Tr. of O.W., at 47:10-22). But Mr. Baker did not find the photograph. JA1263-1264 (Dep. Tr. Reid Baker). Officer Carr directed Mr. Baker to place O.W.'s phone in airplane mode, to power it down, and to hand it to her. JA633. Officer Carr "collected [O.W.'s] iPhone as evidence." JA633, JA634, JA641, JA1253. Mr. Baker then directed O.W. to write another statement about his suspected criminal conduct. JA486-0487, JA952, JA1202, JA1229, JA1232, JA1236. Baker and Officer Carr left the room together while O.W. wrote his second or third confession. JA952, JA1233.

Mr. Baker held O.W. after school hours after Officer Carr informed Mr. Baker that it was not a "paper arrest." JA438, JA792. After this time, Officer Carr returned to O.W., while he sat in the guidance office alone, handed his phone back to him and asked him to show her the photograph. JA918. Officer Carr was in uniform, wearing a gun, and displaying her badge. JA531 (admission no. 4). O.W. was scared and did not believe he could say no. JA675, JA955. Then-thirteen-year-old O.W. complied, and Carr found the photograph inside the phone's text messages. JA638, JA1203.

---

[5]   O.W. pled in his Second Amended Complaint that Mr. Baker "searched the photo gallery of the phone and did not find the photograph." He did not plead that Baker *only* searched the photo gallery. O.W. testified, "And he was like -- he - he searched my phone because I -- I didn't have the photo in there at the time." JA1027. The full scope of this cellular phone search is not on the record.

Mr. Baker notified O.W.'s mother of the incident around 4:00 p.m., which was the end of the school day. JA482.

Officer Carr finally administered the *Miranda* warning to O.W. at 6:10 p.m. and arrested him on charges of possession and distribution of child pornography. JA635. O.W. was not allowed to have his mother, an attorney, or anyone else to aid him during his in-school interrogation. JA632-JA635.

Mr. Baker gave one of O.W.'s written confessions to Officer Carr to be used as criminal evidence against O.W. JA0481, JA533.

> Q. Do you know, how is it that the City came to possess these statements?
>
> A. I want to say Officer Carr asked me for statements. · I -- I think she asked me for the statements.
>
> Q. Did you know why she needed those statements?
>
> A. I think she was conducting her own investigation and needed, I don't know, needed evidence, needed statements. I'm -- I –

JA481 (Dep. Tr. of Reid Baker), JA1032, JA1038.

The next day, on March 6, 2019, Baker took statements from at least six additional students; those statements were delivered to Officer Carr — again outside the judicial process — for O.W.'s prosecution. JA441, JA533.

Baker initially recommended O.W. for expulsion from school. JA1440. O.W. was held in juvenile detention overnight. JA1424. The photograph and the confessions were all introduced against O.W. in his trial. JA1306-JA1350.

The record does not contain any evidence to support a finding that O.W. voluntarily submitted to Mr. Baker's search.

## III.    Procedural History

The Plaintiff-Appellant O.W.'s mother originally filed this action pro se in the United States District Court for the Eastern District of Virginia, in the Richmond Division, on March 5, 2019. JA5. On April 12, 2021, the School Appellees filed a motion to dismiss and in the alternative to transfer venue, JA6, and the City Appellees filed a motion to dismiss the Plaintiff-Appellant's claims, JA6. The court transferred venue to the Norfolk Division on August 2, 2021, JA7, but withheld resolution of the pending motions to dismiss. On December 17, 2021, the district court in the Norfolk division entered its memorandum order on the Defendant-Appellees' motions to dismiss and held that O.W.'s mother, a non-attorney, was not competent to litigate O.W.'s claims in federal court but granted her leave of court to amend her pleading. JA7. Having retained counsel, Appellant filed his First Amended Complaint on January 14, 2022. JA8. Appellees filed motions to dismiss O.W.'s claims again on February 8, 2022, JA8, to which the Plaintiff-Appellant filed his responses on February 22, 2022, JA9. The Defendant-Appellees all filed their answers on March 28, 2022, JA12, JA170-216.

Following the close of discovery on August 2, 2022, the City Appellees and School Appellees filed separate motions for summary judgment. JA288, JA291,

JA342, JA346. The district court reassigned the case to Judge Elizabeth W. Hanes on August 15, 2022. The Plaintiff-Appellant filed a motion for partial summary judgment on August 17, 2022. JA13. Appellees and Appellant agreed to stay proceedings to allow the district court time to decide the numerous outstanding motions and to allow Officer Carr to be heard on her claim of qualified immunity before proceeding to trial. JA20.

The district court ruled on all the outstanding motions on February 14, 2023, wherein it denied O.W.'s motion for partial summary judgment with prejudice and granted the City and School Appellees' motions for summary judgment. JA1162-1163. O.W. appeals.

## <u>SUMMARY OF THE ARGUMENT</u>

O.W. has provided extensive evidence that his school authorities worked jointly in concert with law enforcement to criminally investigate him, to search his cellular phone, and to coerce his criminal confession, as has been the case for many students attending public schools in the City of Virginia Beach over the past twenty years. At a minimum, the evidence in the record is more than enough to establish a genuine dispute of material fact on most, if not all his claims. The district court erred by failing to credit O.W.'s evidence as true, by repeatedly drawing inferences in the Defendant-Appellees' favor and shifting burdens on the Plaintiff-Appellant while he opposed the motions for summary judgment.

Having imposed the heightened burden on O.W., the district court resolved issues of fact against him including that O.W.'s confessions were voluntary. *See* Judgment at 21 n.20 ("While the Court concludes that O.W.'s statements were voluntary, it does not condone the investigatory techniques practiced by the City and the School Board.").

The Defendant-Appellees violated O.W.'s Fourth Amendment right be free from unreasonable searches when both Assistant Principal Reid Baker and Officer Marie Carr searched the digital contents of his cellular phone to gather evidence intended for use in O.W.'s prosecution.

The Supreme Court has repeatedly explained the difference between an administrative search that just so happens to turn up evidence of criminality and one conducted for that law enforcement purpose. *Ferguson v. City of Charleston*, 532 U.S. 67, 88, 121 S. Ct. 1281, 1294 (2001) (explaining that, "The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes.") (Kennedy, J., concurring in the judgment). For this reason, the district court was wrong when it applied the rule applicable only to special needs cases to determine the constitutionality of the search that was conducted for law enforcement purposes.

The Defendant-Appellees violated O.W.'s rights under the Fifth Amendment's Self-Incrimination Clause and Fourteenth Amendment's Due Process Clause by interrogating him together in a small office, when he was in custody, and requiring him to write a criminal confession for use in his prosecution. The district court erroneously resolved facts in the Defendant-Appellees' favor by finding O.W.'s confessions were not coerced.

The district court added an element of "conspiratorial intent" to the Plaintiff-Appellant's prima facie § 1983 conspiracy claim. The record is replete with evidence that the Defendant-Appellees acted jointly in concert in the acts that deprived O.W. of his rights, and the district court reached the wrong conclusion on this count when it held that Plaintiff-Appellant failed to come forward with more proof of an agreement. The district court also erred when it refused to decide the underlying constitutional claims.

Finally, the district court erred when it denied the Appellant's motion for partial summary judgment with prejudice.

## STANDARD OF REVIEW

On appeal, this Court reviews "de novo the district court's summary judgment award." *J.D. ex rel. Doherty v. Colonial Williamsburg Found.*, 925 F.3d 663, 669 (4th Cir. 2019). The Court will only "grant a movant's summary judgment motion when 'there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law.'" Fed. R. Civ. P. 56(a); 925 F.3d at 669. In applying

this standard, the Court must view the evidence in the light most favorable to O.W.,

the non-moving party, and draw all reasonable inferences in his favor. *See Laird v.*

*Fairfax Cty.*, 978 F.3d 887, 892 (4th Cir. 2020). "That means that '[the Court] may

not credit [Appellees'] evidence, weigh the evidence, or resolve factual disputes in .

. . [Appellees'] favor.*" Knibbs v. Momphard*, 30 F.4th 200, 207 (4th Cir. 2022)

(alterations in original). "The evidence of the nonmovant is to be believed, and all

justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986).

## **ARGUMENT**

### **1. THE WARRANTLESS, CONSENTLESS CELLULAR PHONE SEARCH VIOLATED O.W.'S RIGHT UNDER THE FOURTH AMENDMENT.**

The Fourth Amendment to the United States Constitution proscribes

unreasonable searches and seizures. Fully, it provides that,

> The right of the people to be secure in their persons, houses, papers, and
> effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the place
> to be searched, and the persons or things to be seized.

U.S. CONST. AMEND. IV.

The Supreme Court of the United States has time and again reaffirmed the

rule that "searches conducted outside the judicial process, without prior approval by

judge or magistrate, are *per se* unreasonable under the Fourth Amendment —

subject only to a few specifically established and well delineated exceptions." *Thompson v. Louisiana*, 469 U.S. 17, 19-20, 105 S. Ct. 409, 410 (1984) (emphasis in original) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

**New Jersey v. T.L.O.**

In *New Jersey v. T. L. O.*, 469 U.S. 325, 339, 105 S. Ct. 733, 742 (1985), the Supreme Court announced the standard for assessing the legality of searches conducted by public school officials on school grounds. There, a teacher caught fourteen-year-old T.L.O. and her friend smoking cigarettes in the bathroom and took the girls to the assistant principal's office to investigate their violation of the school rule. *Id.* at 328, 105 S. Ct. at 735. After detaining T.L.O., the assistant principal "demanded to see her purse," opened and searched it. *Id.* at 328, 105 S. Ct. at 736. Inside the purse, he found a package of cigarettes, cigarette rolling papers, marijuana, and other items. *Id.* The assistant principal notified T.L.O.'s mother along with the police and later turned the evidence he discovered during the disciplinary investigation over to the police. *Id.* T.L.O.'s mother took her to the police station where she confessed to selling marijuana at school. *Id.* at 329, 105 S. Ct. at 736.

Articulating what would later become the "special needs doctrine," the Supreme Court held that school order and discipline[6] are some of the "exceptional

---

[6]  *Id.* at 469 U.S. at 340, 105 S. Ct. at 742 ("[R]equiring a warrant would impede the 'swift and *informal disciplinary procedures* needed in the schools'"); *id.* ("[E]vents calling for *discipline* are frequent occurrences and sometimes require

circumstances in which special needs, beyond the normal need for law enforcement, make the warrant and probable-cause requirement impracticable." Going forward, the Court held, "the legality of a search of a student [for disciplinary purposes] should depend simply on the reasonableness, under all the circumstances, of the search." *Id.* at 341, 105 S. Ct. 733 at 742.

However, the Court took special care to limit its holding in *T.L.O.* to "searches carried out by school authorities *acting alone and on their own authority*." *Id.* at 341 n.7, 105 S. Ct. at 743 (emphasis added). The Court explained that, "This case does not present the question of the appropriate standard for assessing the legality of searches conducted by school officials in conjunction with or at the behest of law enforcement agencies, and we express no opinion on that question." *Id.* (emphasis added). The district court therefore erred when it applied *T.L.O.* to test the legality of the search at issue which was conducted in conjunction with the police for criminal investigatory purposes.

**Ferguson v. City of Charleston**

In *Ferguson v. City of Charleston*, the Supreme Court held that a government hospital's search program was unlawful where hospital staff, in partnership with a law enforcement agency, tested the discarded urine of suspected drug-addicted

---

immediate, effective action."); *id.* ("Against the child's interest in privacy must be set the substantial interest of teachers and administrators in maintaining *discipline* in the classroom and on school grounds.") (emphasis added)).

women and routinely reported and turned over evidence to the police for criminal arrests and prosecutions. 532 U.S. at 88, 121 S. Ct. at 1294.

Some features of the search policy and agreement in *Ferguson* — (1) the policy instructed hospital staff on how to identify criminal activity, *id.* at 76, 121 S. Ct. at 1287; (2) it aided employees in collecting and preserving evidence, "presumably to make sure that the results could be used in subsequent criminal proceedings"; (3) it established a policy of routine police intervention; and (4) it described arrest procedures. Notably, "the policy made no mention of any change in the prenatal care of such patients, nor did it prescribe any special treatment for the newborns." *Id*. at 73, 121 S. Ct. at 1285.

Procedurally, in *Ferguson*, the district court rejected the defense that the searches had "special non-law enforcement purposes," *id*. 532 U.S. at 73, because the police had far too much involvement in the program, *id*. at 74. The district court submitted the factual question of consent to the jury and required a verdict for the plaintiffs unless the jury found that the plaintiffs consented. *Id*. The plaintiffs ultimately lost on all counts and appealed to this Court, assigning error to the district court's judgment, in part, on the ground that the district court improperly submitted the consent issue to the jury. This Court passed on the question because it held that, even if the plaintiffs did not consent, the search was reasonable under the special needs doctrine. The Supreme Court ultimately reversed, holding that the search

program was unlawful because it was "designed to obtain evidence of criminal conduct . . . that would be turned over to police and that could be admissible in subsequent criminal prosecutions"[7] and remanded for further proceedings on the issue of consent. *Ferguson*, 532 U.S. at 88, 121 S. Ct. at 1294.

The Supreme Court concluded that the urine-screen searches may have been conducted for the *ultimate purpose* of encouraging drug-addicted pregnant women into substance abuse treatment, and thereby achieving the hospital's albeit noble objective of ensuring the health and safety of expectant mothers, fetuses, and infants. The policy and tests were unlawful because "the immediate objective of the searches was to generate evidence for law enforcement purposes in order to reach that goal." *Id*. at 69, 121 S. Ct. at 1284. "Given that purpose and given the extensive involvement of law enforcement officials at every stage of the policy, [the] case

---

[7] See also *id*. (explaining that, "None of our special needs precedents has sanctioned the routine inclusion of law enforcement, both in the design of the policy and in using arrests, either threatened or real, to implement the system designed for the special needs objectives.") (Kennedy, J. concurring); *id*. at 83 n. 20, 121 S. Ct. at 1291 ("In none of our previous special needs cases have we upheld the collection of evidence for criminal law enforcement purposes. Our essential point is the same as JUSTICE KENNEDY's -- the extensive entanglement of law enforcement cannot be justified by reference to legitimate needs") (capitalization in original)); *id.* at 88, 121 S. Ct. at 1294 (explaining that, "The traditional warrant and probable-cause requirements are waived in our previous cases on the explicit assumption that the evidence obtained in the search is not intended to be used for law enforcement purposes." (Kennedy, J., concurring)).

simply [did] not fit within the *closely guarded* category of 'special needs.'" *Id.* (emphasis added).

Distinguishing *T.L.O.* and its progeny, the Supreme Court explained in *Ferguson*, that while government actors "may have a duty to provide the police with evidence of criminal conduct that they *inadvertently* acquire in [scope of their employment], when they undertake to obtain such evidence from [persons] *for the specific purpose of incriminating [them]*, they have a special obligation to make sure that the [subjects] are fully informed about their constitutional rights, as standards of knowing waiver require." *Id.* at 69, 121 S. Ct. at 1284 (analogizing *Miranda*, 384 U.S. 436, 447, 86 S. Ct. 1602)).

### A. The Special Needs Doctrine does not Apply to the Search because the Search was Intended to Yield Criminal Evidence.

*T.L.O.* was premised on "the substantial interest of teachers and administrators in maintaining discipline in the classroom and on school grounds." 469 U.S. at 339; *see also Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 653, 115 S. Ct. 2386, 132 L. Ed. 2d 564 (1995).[8] For this reason, courts have been reluctant to extend *T.L.O.* to cases involving government conduct unrelated to that interest even where the conduct occurs on school grounds. For example, the Tenth Circuit held in *Jones*

---

[8] See also *T. L. O.*, 469 U.S. at 339-40, 105 S. Ct. at 742 ("Accordingly, we have recognized that maintaining security and order in the schools requires a certain degree of flexibility in school disciplinary procedures, and we have respected the value of preserving the informality of the student-teacher relationship.").

*v. Hunt*, 410 F.3d 1221, 1228 (10th Cir. 2005), that a seizure by a deputy sheriff and social worker on school grounds did "not merit application of the *T.L.O.* standard" because it did "not implicate the policy concerns addressed in *T.L.O.*" *Id*. That court, however, declined to explain which Fourth Amendment standard should apply to the case of a joint criminal investigation on school grounds.

And in *Greene v. Camreta*, the Ninth Circuit held that the "'special needs' doctrine did not apply to seizures on school grounds in which 'law enforcement personnel and purposes were . . . deeply involved.'" 588 F.3d 1011, 1026-27 (9th Cir. 2009), *vacated as moot sub nom.* (citing *Ferguson*, 532 U.S. at 79 n.15). Such is the case here. The Supreme Court granted certiorari on this issue but did not reach the merits due to mootness. *See Camreta v. Greene*, 131 S. Ct. 2020, 2026-27 (2011). Nonetheless, the Supreme Court did not express disapproval of the Ninth Circuit's reasoning in *Greene*. *C. B. v. City of Sonora*, 769 F.3d 1005, 1023 n.14 (9th Cir. 2014). The Ninth Circuit later held that the same rule should apply to "dual-purpose investigations" and "purely investigatory examinations" "where one of the purposes is investigatory." *Mann v. Cty. of San Diego*, 907 F.3d 1154, 1162 (9th Cir. 2018), *cert denied*. Thus, the Court would be well-reasoned in holding that the search was unreasonable even if it were found to have served dual criminal and disciplinary purposes.

The district court distinguished *Ferguson* because it took place in a government hospital, whereas *T.L.O.* and the case before the Court today occurred on school grounds. However, the problem with *T.L.O.* is that it did not involve a criminal investigation at all. *T.L.O.*'s assistant principal notified T.L.O.'s mother of the incident contemporaneously with notifying the police; this not only evinced his intent to afford T.L.O.'s mother due process but it also placed T.L.O. in the position to make intelligent decisions about her rights as soon as the disciplinary investigation ripened into a criminal investigation. There is no reason to believe the assistant principal searched T.L.O. "for the specific purpose of incriminating her." Mr. Baker and Officer Carr intended a criminal investigation from the start; that is why Baker notified Officer Carr first and did not notify O.W.'s mother until the investigation was over. Further, *T.L.O.* does not involve an agreement between the police and a third-party government agency to investigate criminal suspects and to share information, as is the case here and was the case in *Ferguson*.

The features of the search policy here undeniably resemble those from *Ferguson*— here, (1) VBCPS school authorities are required to notify their police partners of all suspected student criminality, which necessarily implies their familiarity with and understanding of criminal laws, *see T. L. O.*, 469 U.S. at 350 n.1, 105 S. Ct. at 747 (stating that, "Unlike police officers, school authorities have no law enforcement responsibility or indeed any obligation to be familiar with the

criminal laws."); (2) it uses routine police intervention in a special needs setting; and (3) it outlined arrest procedures, among other features. JA334-341 (MOU); *see Ferguson*, at 76, 121 S. Ct. at 1287. Like the curious feature of the policy in *Ferguson*, which "made no mention of any change in the prenatal care of such patients, nor did it prescribe any special treatment for the newborns," the policy here says little to nothing about how the policy improves school discipline and order outside routine crime control. *See generally*, MOU, at JA334-341. Given the "extensive involvement of law enforcement officials at every stage of the policy," the Court should find that "this case simply does not fit within the closely guarded category of 'special needs,'" *id*. at 69, 121 S. Ct. at 1284. As true in *Ferguson*, a jury could infer that the VBPCS policy of jointly investigating students in the disciplinary setting was "designed to obtain evidence of criminal conduct . . . that would be turned over to police and that could be admissible in subsequent criminal prosecutions."

The evidence suggests strongly that Mr. Baker searched O.W. "for the specific purpose of incriminating [him]." After all, Mr. Baker did bypass four security guards on school campus to instead alert Officer Carr, a sworn police officer, of what he described to her as possible "child pornography." In accordance with the policy, Mr. Baker alerted Officer Carr before he even detained O.W. — at a time when he

admittedly did not know which, if any, school disciplinary infraction O.W.'s conduct might have violated. JA878 (Dep. Tr. of Reid Baker, at 16:4-12).

If permanently dispossessing O.W. of the phone were not enough to control his behavior or to bring order to the school environment, it is hard to imagine how searching the photo gallery of the phone promised to help. Indeed, a photograph described as "child pornography" cannot be admitted into evidence in any school disciplinary hearing. It cannot reasonably be disputed that T.L.O.'s assistant principal had a responsibility to turn over any evidence he inadvertently found during a disciplinary investigation; but a jury could conclude that Baker searched O.W.'s phone for no purpose other than to gather evidence from O.W. for his prosecution.

According to the district court, *Ferguson* is inapposite because it involved "the permissibility of suspicionless searches," JA1144. However, the Court has always required a balancing test where the degree of intrusion is weighed against the government interest to find the level of suspicion required for the search.[9] A cellular

---

[9] The Court has performed the same analysis for special needs cases across a myriad of contexts. *See Bd. of Educ. v. Earls*, 536 U.S. 822 (2002) (suspicionless drug testing); *Vernonia Sch. Dist. v. Acton*, 515 U.S. 646 (1995) (suspicionless drug testing for high school athletes); *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656 (1989) (suspicionless drug testing of Customs Service positions); *Griffin v. Wisconsin*, 483 U.S. 868 (1987) (probationer home searches upon reasonable grounds); *O'Connor v. Ortega*, 480 U.S. 709 (1987) (workplace searches of public employees); *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976) (traffic stops at border checkpoints).

phone search requires substantially more justification than a search of a person's other personal effects, specifically, it requires more justification than that required to search the discarded urine that was the subject of *Ferguson*. Also, in *Ferguson*, the panel of this Court and the Supreme Court merely assumed, without deciding, the tests were suspicionless.[10]

The search cannot be sustained under *T.L.O.* because, while it occurred on school grounds, it was conducted with police under a long-standing programmatic search policy, which was – at least in part – designed by police to gather evidence of student criminality in a manner that avoids all the burdens of direct police action.

What is missing from the record is any evidence about any safeguard VBCPS has in place to prevent police officers from redisclosing student records or from applying the search program discriminately between students of different races, abilities, and socio-economic backgrounds. *United States v. Curry*, 965 F.3d 313, 320 n.4 (4th Cir. 2020) ("Moreover, special needs cases all involve a critical feature not present here: programmatic safeguards designed to protect against a law enforcement officer's arbitrary use of unfettered discretion.").

---

[10]  "In a footnote to their brief, respondents do argue that the searches were not entirely suspicionless. They do not, however, point to any evidence in the record indicating that any of the nine search criteria was more apt to be caused by cocaine use than by some other factor, such as malnutrition, illness, or indigency. More significantly, their legal argument and the reasoning of the majority panel opinion rest on the premise that the policy would be valid even if the tests were conducted randomly." *Ferguson*, 532 U.S. at 77 n.10, 121 S. Ct. at 1288.

It is no secret that VBCPS disciplines black male students, such as the Plaintiff-Appellant, more harshly and refers them to law enforcement more frequently,[11] and it is a matter of common sense that these students would be subject to the joint investigative policy more often. But this is not to suggest the joint interrogation and search policy is not harming children of all races, abilities, and genders.

### B. Even under the Special Needs Doctrine, the Search was Unreasonable because it was not Justified at its Inception, and the Scope of the Search is not Known.

In *T.L.O.*, the Court "applied a standard of reasonable suspicion to determine the legality of a school administrator's search of a student" and "held that a school search 'will be permissible in its scope when the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction,'" *Safford Unified Sch. Dist. #1 v. Redding*, 557 U.S. 364, 370, 129 S. Ct. 2633, 2639 (2009) (citing *T.L.O.*, at 345, 105 S. Ct. at 733).

Under *T.L.O.*, in assessing a school disciplinary search, the Court should weigh the invasiveness of the search, the age and gender of the student, and the nature of

---

[11] *See* Civil Rights Data Collection (ed.gov); s*ee* Virginia Department of Education's Safe Schools Information Report Data Retrieval tool; Gabriella Souza, *Racial Disparities Get Beach Schools Chief's Attention*, THE VIRGINIAN-PILOT (February 19, 2015), available at https://www.pilotonline.com/news/education/artic le_984bf825-eb58-5c0da46a-eaadc7bed25d.html.

the harm in determining whether a search was reasonable. *T.L.O.*, at 345, 105 S. Ct. at 733). In *Safford*, the Supreme Court held that the strip search of a student for drugs was unreasonable even though it was conducted to mitigate a potentially imminent risk to students' health and safety. There, a student was believed to have been in possession of prescription-strength ibuprofen and over-the-counter naproxen, which the Court acknowledged could have caused "real harm" to students if taken in large doses. *Id.* at 375, 129 S. Ct. at 2642. However, school officials had "no reason to suspect" there was a threat of harm to students because it had no information that the student had been distributing large doses to students. *Safford*, at 376, 129 S. Ct. at 2642 (explaining that the school official must have been aware of both the "nature [of the offense] and limited threat" to students). For this reason, "the content of the suspicion failed to match the degree of intrusion." *Id.* The Court held that "both subjective and reasonable societal expectations of personal privacy support the treatment of such a search as categorically distinct, requiring distinct elements of justification on the part of school authorities for going beyond a search of outer clothing and belongings." *Id.* at 374, 129 S. Ct. at 2641.

Under *Safford*, a cellular phone search requires a more compelling justification than that required to search a student's other personal effects, *id.*; *see also Riley v. California*, 573 U.S. 373, 394-95, 134 S. Ct. 2473, 2489 (2014). In fact, even in the context of a criminal arrest, society has come to expect more privacy in their digital

data than in a strip search of their person. *Compare Florence v. Bd. of Chosen Freeholders*, 566 U.S. 318, 326, 132 S. Ct. 1510, 1515 (2012) (finding it reasonable to strip search an arrestee entering a correctional facility), *with Riley v. California*, at 394-95, 134 S. Ct. at 2489 (finding it unreasonable to search an arrestee's cellular phone data). *Safford* illustrates that the standards of reasonableness for a highly invasive search differs from the standards for a less invasive search, and that the level of suspicion and the threat of harm need to be higher to justify a highly invasive search.

The district court said that, "Mr. Baker limited the search to the photo gallery and did not otherwise search the phone." JA1145. The allegation that Mr. Baker searched the photo gallery of O.W.'s phone does not, in itself, support the inference that Baker *only* searched the photo gallery. The record does contain any admissible evidence regarding the scope of the search, and Baker never explained his objectives or his distinct elements of justification for searching O.W.'s phone. JA1263-1264. Nonetheless, the search occurred at the end of the school day or after school hours, after Baker had already permanently dispossessed O.W. of the phone. The uncontradicted evidence shows that Baker placed the phone in airplane mode and powered it down such that any evidence inside the photo gallery could not have been tampered with or remotely wiped. *Riley*, at 390, 134 S. Ct. at 2487 ("In any event, as to remote wiping, law enforcement is not without specific means to address the

threat. Remote wiping can be fully prevented by disconnecting a phone from the network.").

It would also be reasonable for a jury to infer pretext where, for the last twenty years, school authorities have given police officers all the criminal evidence they needed to arrest and prosecute students. *See*, *Skinner v. Ry. Labor Executives' Ass'n*, 489 U.S. 602, 109 S. Ct. 1402 (1989).

The Court should reverse or vacate the summary judgment award on this issue because, in part, Baker's objective for the search and the scope of the search are still unknown. Material facts are therefore still in dispute. It is hard to imagine any circumstance where a school administrator's search for suspected child pornography would not be "excessively intrusive in light of the age and sex of the student," because the search itself would only heighten any alleged exploitation. Other than routine crime control, Baker has not and cannot show any justification for the search.

### C. *T.L.O.* does not Authorize Warrantless Cellular Phone Searches in the Public School Setting.

Citing *Terry v. Ohio*, 392 U.S. 1, 30, 88 S. Ct. 1868, 1884 (1968), this Court explained that "the constitutional standards governing police action in such circumstances match exactly those that regulate searches and seizures of students." *Wofford v. Evans*, 390 F.3d 318, 327 (4th Cir. 2004). It is of course well settled that a *Terry* search "in the absence of probable cause to arrest . . . must, like any other search, be strictly circumscribed by the exigencies which justify its initiation."

*Terry*, 392 U.S. at 26. *Terry* does not justify cellular phone searches under *Riley v. California*, 573 U.S. 373, 394-95, 134 S. Ct. 2473, 2489 (2014), and this Court should hold that *T.L.O.* does not justify cellular phone searches of a students on school grounds on mere reasonable suspicion.

### 2. O.W.'S CONFESSIONS WERE INVOLUNTARY UNDER THE FIFTH AMENDMENT'S SELF-INCRIMINATION CLAUSE AND THE FOURTEENTH AMENDMENT'S DUE PROCESS CLAUSE.

"The Fifth Amendment, made applicable to the States by the Fourteenth Amendment provides that '[n]o person . . . shall be compelled in any criminal case to be a witness against himself.'" U.S. CONST. AMEND. V; *Vega v. Tekoh*, 597 U.S. ___ (2022) (quoting *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973)). "This Clause 'privileges [a person] not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings.'" *Id*.

"The test for determining whether a statement is voluntary under the Due Process Clause 'is whether the confession was extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *United States v. Braxton*, 112 F.3d 777, 780 (4th Cir. 1997) (quoting *Hutto v. Ross*, 429 U.S. 28, 30, 97 S. Ct. 202 (1976) (alterations in original) (some internal quotation marks omitted)).

According to the district court, "O.W. admitted that he had shown the photograph to other students before any alleged coercion began." JA1149. O.W. respectfully disagrees. He was thirteen years old and already inside a 72 sq. ft. room with an armed, uniformed police officer sitting nearest the door and one of his school's ultimate authorities across the desk from him; he already did not have his mother or an attorney present; and he already had been warned that he might be disciplined if he did not just confess.

Nonetheless, evidence which is compelled by a government actor violates the Fifth Amendment in any setting, permitting the elicitation provokes a person "to give an answer which discloses a fact that would form a necessary and essential part of a crime which is punishable by the laws." *United States v. Burr*, 25 F. Cas. 38, 40; *Ullmann v. United States*, 350 U.S. 422, 438-39, 76 S. Ct. 497, 507 (1956) ("also that its sole concern is, as its name indicates, with the danger to a witness forced to give testimony leading to the infliction of 'penalties affixed to the criminal acts'"). Thus, assuming O.W.'s first admission to having shown the photograph was voluntary, that would not indicate whether his later confessions were also. Cf. *Lyons v. Oklahoma*, 322 U.S. 596, 598, 64 S. Ct. 1208, 1210 (1944). He was entitled to withhold information regarding each and every element of the offenses with which he was ultimately charged.

Under *Tekoh*, the fact that Officer Carr failed to Mirandize O.W. before questioning him in the custodial setting is not independently violative of the right against compelled self-incrimination but is one fact supporting the involuntariness of his statements.

A reasonable jury would conclude that Mr. Baker and Officer Carr, together, coerced O.W.'s oral and written confessions. *See Couch v. United States*, 409 U.S. 322, 329, 93 S. Ct. 611, 616 (1973); *Johnson v. United States*, 228 U.S. 457, 459, 33 S. Ct. 572 (1913). This kind of pressure applied to a thirteen-year-old child who did not have the benefit of a parent or his attorney present is so reasonably calculated to inspire fear that the resultant confession should be regarded as compulsory. *E.g.*, *Haley v. Ohio*, 332 U.S. 596, 600, 68 S. Ct. 302, 304 (1948); *Chambers v. Florida*, 309 U.S. 227, 230, 60 S. Ct. 472, 474 (1940).

Further, in this context, the Supreme Court has repeatedly rejected criminal interrogations conducted through third party friendly faces. *See*, *e.g.*, *Massiah v. United States*, 377 U.S. 201, 206, 84 S. Ct. 1199, 12 L. Ed. 2d 246 (1964) (holding post-indictment confession violative of the Sixth Amendment where elicited by police informant); *Maine v. Moulton*, 474 U.S. 159, 176, 106 S. Ct. 477, 88 L. Ed. 2d 481 (1985); *see also Commonwealth v. Gatewood*, No. 1420-12-1, 2013 Va. App. LEXIS 27, at *16-17 (Ct. App. n. 22, 2013) (unpublished) (for treatment in Virginia

courts) (holding confessions obtained in violation of Fifth and Sixth Amendments where elicited by a social services employee for criminal investigative purposes).

The district expressed some concern with the VBCPS/VBPD's joint investigative practice, but it nonetheless concluded that O.W.'s confessions were voluntary. JA1149, at n.20 ("While the Court concludes that O.W.'s statements were voluntary, it does not condone the investigatory techniques practiced by the City and the School Board."). In so doing, the district court resolved this fact against O.W. to resolve a motion for summary judgment against him.

At a minimum, the record establishes genuine disputes of material fact regarding whether O.W was compelled to admit facts regarding the (1) identity of the person depicted in the photograph, (2) the contents of the photograph, and (3) identity of the person who texted the photograph to G.C.

The district court further stated that,

> The questioning was conducted by a school official in a familiar setting—the school guidance office—and the entire incident occurred over the course of an afternoon." Although certain facts—O.W.'s age, that he was alone, Officer Carr's presence, and Mr. Baker's admonition about violating the Student Code of Conduct— may have influenced O.W., they are not enough, without more, to suggest O.W.'s will was overborne.

JA1148-1149, Memorandum Opinion. On a motion for summary judgment, the question for the court was not whether it believed O.W.'s confessions were coerced because such is a question of fact. *Schneckloth v. Bustamonte*, 412 U.S. 218, 227, 93

S. Ct. 2041, 2048 (1973) (noting that the question of whether waiver was "in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."). The questions for the court to decide were whether the material, undisputed facts were so one sided that they constitute coercion as a matter of law or whether O.W. failed to present *any* evidence of coercion such that summary judgment should have been granted to the Defendant-Appellees. The district court erred when it weighed the evidence against O.W. and awarded summary judgment to the Defendant-Appellees.

### 3. A CIVIL CONSPIRACY UNDER 42 U.S.C. § 1983 REQUIRES PROOF OF CONCERTED CONDUCT AND NOT ADDITIONAL PROOF OF CONSPIRATORIAL INTENT.

"To establish a civil conspiracy under § 1983, Appellants must present evidence that the Appellees acted jointly in concert and that some overt act was done in furtherance of the conspiracy which resulted in Appellants' deprivation of a constitutional right." *Hinkle v. City of Clarksburg*, 81 F.3d 416, 421 (4th Cir. 1996). Stated another way, a litigant makes a prima facie showing of a civil conspiracy by establishing that (1) the defendants agreed and coordinated to engage in an act, (2) at least one of the co-conspirators took an overt step in furtherance of the agreement, and (3) the act "resulted in Appellants' deprivation of a constitutional right," *id*. O.W.'s goal in opposing motions for summary judgment was to produce evidence that would have "reasonably [led] to the inference that Appellees positively or tacitly

came to a mutual understanding to try to accomplish a common and unlawful plan." *Id*.

The district court erroneously treated conspiratorial intent as an additional element of a prima facie § 1983 claim. Citing *Hinkle*, the district court said that, "While O.W. is not required to come forward with direct evidence, he has a 'weighty burden' and must show "specific circumstantial direct evidence that each member of the alleged conspiracy shared the same conspiratorial objective."" JA1150-1151 (quoting *Hinkle*, 81 F.3d at 421). But *Hinkle* is a circumstantial evidence case where the plaintiffs had no direct evidence that the government defendants acted in concert to deny them access to the court. It was only because of their failure to "come forward with direct evidence" that they were required to show other evidence of conspiratorial intent.

> Appellants did not produce any evidence, either direct or circumstantial, that Appellees acted in concert to obstruct Appellants' access to the courts. Appellants' evidence did not disclose any communication between Officer Walker, Officer Lake, Dr. Saoud, Dr. Frost or others that might give rise to an inference of an agreement to commit any acts, wrongful, or otherwise. Nor does Appellants' evidence give rise to an inference that each alleged conspirator shared the same conspiratorial objective.

*Hinkle*, 81 F.3d at 421-22 (emphasis added).

O.W. was not required to show circumstantial evidence of "conspiratorial intent" because the record is teeming with direct evidence of concerted conduct. For example, in *Hafner v. Brown*, 983 F.2d 570, 577 (4th Cir. 1992), this Court held that

a plaintiff established his § 1983 conspiracy claim with testimonial evidence that a defendant sat on the plaintiff's legs while other officers inflicted excessive force. There, on direct examination, the officer "acknowledged that he sat on [plaintiff's] legs to bring him under control." *Id*. For this reason, this Court concluded that "a factfinder could reasonably conclude that [defendant] acted in concerted activity with [the police officers]," and the plaintiff was not required to show additional circumstantial evidence of conspiratorial intent.

In keeping with VBCPS and VBPD policies and practices, Officer Carr and Mr. Baker agreed, positively or tacitly as a matter of custom and routine, that they were going to detain then-thirteen-year-old O.W. to investigate him for a criminal offense. Officer Carr and Mr. Baker knew from the outset of the investigation that the fruit from any search would be used for O.W.'s arrest and prosecution, and yet they were going to search his cellular phone on reasonable suspicion rather than on consent or a search warrant. They were going to elicit incriminating responses from O.W., in a custodial setting,[12] but they were not going to afford him his rights under *Miranda* or even advise him of his rights to aid him in making a knowing waiver. They were going to compel O.W. to make oral and written confessions regarding his own suspected criminal conduct and use those statements against him in a later

---

[12] O.W.'s age informed the custody analysis under *J. D. B.*, 564 U.S. at 297, 131 S. Ct. at 2418.

prosecution. "[A] factfinder could reasonably conclude that [VBCPS and Baker] acted in concerted activity with [the police officers]."

Baker and Carr ultimately wanted confessions and the photograph to use against O.W. in court, and co-conspirators are liable for unlawful acts performed by the other within the scope of the agreement. There can be no good reason why a school official would lead a criminal investigation when a uniformed officer is present other than to help police take advantage of the reasonable suspicion standard on school grounds and the custodial setting. But "that is how it's always been." JA499-500, JA836-0837.

If at all necessary, the record establishes that this joint criminal investigative practice has been in place for at least nineteen years. It would be more than reasonable for a jury to infer that a "long course of conduct" — nineteen years of joint- VBPD/VBCPS investigations leading to arrests and prosecutions — "executed in the same way" is proof of a tacit understanding. *Direct Sales Co. v. United States*, 319 U.S. 703, 714, 63 S. Ct. 1265, 1270 (1943).

The evidence undoubtedly establishes the Defendant-Appellees were acting pursuant to their common plan. The district court therefore erred when it refused to consider the constitutional claims underlying the conspiracy claim.

4. **THE DISTRICT COURT ERRED IN HOLDING THAT APPELLANT FAILED TO ESTABLISH HIS CLAIMS UNDER *MONELL*.**

The district court refused to consider O.W.'s *Monell v. Dep't of Soc. Servs*., 436 U.S. 658, 664, 98 S. Ct. 2018, 2022 (1978), claims against the City of Virginia Beach and the School Board of the City of Virginia Beach because it held that O.W. failed to show evidence of a requisite constitutional violation. For all the foregoing reasons, the record is sufficient to allow a reasonable jury to infer the Defendant-Appellees violated O.W.'s constitutional rights. With reasonable inferences afforded to O.W., as required on a motion for summary judgment against him, the jury would likely infer that the Defendant-Appellees are engaged in a practice that flows from the top downward, or, considering O.W.'s proof of the long-standing nature of the policies and customs, unlawful acts that are so persistent and widespread that they constitute standard operating procedures.

5. **THE DISTRICT COURT ERRED IN DENYING APPELLANT'S PARTIAL MOTION FOR SUMMARY JUDGMENT.**

The district court denied O.W.'s motion for partial summary judgment "with prejudice." *See United States v. Goodson*, 204 F.3d 508 (4th Cir. 2000) (discussing the prejudice ruling in the criminal context). The authority of the district court to grant or deny a motion for summary judgment is expressed in Fed. R. Civ. P. 56. Rule 56 does not provide for a denial "prejudice." *See Andes v. Versant Corp*., 788 F.2d 1033, 1037 (4th Cir. 1986) (stating that an order dismissing a plaintiff's claim

under Fed. R. Civ. P. 41(b) would constitute an abuse of discretion where not authorized by the rule). The district court therefore erred in denying the Plaintiff-Appellant's motion for partial summary judgment with prejudice. The Court should reverse or vacate the judgment and remand with instructions to grant summary judgment in favor of O.W., as may be appropriate.

## CONCLUSION

For the reasons set forth above, O.W. respectfully asks this Court to reverse, or at minimum vacate, the Order granting summary judgment to the Defendant-Appellees and the Order denying partial summary judgment to O.W. dated February 14, 2023 (ECF No. 150, 151), as finalized by the district court on March 5, 2024 (ECF No. 162, 163) and to grant O.W. all other relief the Court deems just and appropriate including to remand the case to the district court with instructions to enter judgment in favor of O.W.

## REQUEST FOR ORAL ARGUMENT

O.W. respectfully requests that this Court hear oral argument in this case. This appeal raises serious Constitutional issues regarding the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Respectfully Submitted,

O.W.,

By:   <u>/s/ Makiba Gaines</u>
Makiba Gaines, Esq.
Virginia State Bar No. 93983
POLARIS LAW FIRM, P.L.L.C.
1403 Greenbrier Parkway, Suite 220
Chesapeake, VA 23320
Phone: (757) 905-2079
Facsimile: (757) 866-5744
mg@legalhep757.com
*Counsel for Appellant*

## **CERTIFICATE OF COMPLIANCE**

In accordance with Rules 32(a)(7)(B) and (C) of the Federal Rules of Appellate Procedure, the undersigned counsel for appellant certifies that the accompanying brief is printed in 14 point typeface, with serifs, and, including footnotes, contains no more than 14,000 words. According to the word-processing system used to prepare the brief, Microsoft Word, it contains 10,339 words.

By:    /s/ Makiba Gaines
       Makiba Gaines, Esq.


## **CERTIFICATE OF SERVICE**

I hereby certify that on June 13, 2024, I electronically filed the foregoing brief with the Clerk of the Court using the CM/ECF System which will send notice of such filing to the following registered CM/ECF users:

By:    /s/ Makiba Gaines
       Makiba Gaines, Esq.